IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

THOMAS M. IRBY                                                    PETITIONER

VS.                                        CIVIL ACTION NO 3:13cv953-DPJ-FKB

CLARKE COUNTY                                                    RESPONDENT


**REPORT AND RECOMMENDATION**


**I.  INTRODUCTION**

Thomas M. Irby was convicted in the Circuit Court of Clarke County, Mississippi, of DUI maiming.  He was sentenced as a habitual offender to serve twenty-five years without the possibility of parole.  The Mississippi Court of Appeals affirmed his conviction and sentence.  *Irby v. State*, 49 So. 3d 94 (Miss. 2010).  Irby filed an application to proceed in the trial court with a motion for post-conviction relief (PCR); that application was denied. He then filed the present petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Having considered the petition, response, and the state court record, the undersigned recommends that habeas relief be denied.


**II. EVIDENCE AT TRIAL**

On the afternoon of May 10, 2008, Olivia and Justin Miller were traveling in their minivan headed north on CR 430, a two-lane highway in Clarke County, Mississippi. Olivia, who was driving, testified that as she topped the hill, she saw a Ford truck traveling toward her in the northbound lane.  Olivia applied her brakes but initially stayed in her lane, believing the truck would return to the southbound lane.  When the truck did not do

so, she swerved to the left into the southbound lane in an attempt to reach the shoulder and avoid a collision.  In her testimony, she explained that she decided to swerve left rather than right because the left shoulder was relatively flat, whereas the right shoulder had a ditch.   Irby, who was driving the Ford truck, also attempted at the last minute to move into the southbound lane, and the two vehicles collided head-on.  Irby, Olivia, and Justin were all transported to Anderson Regional Medical Center in Meridian for treatment.  Justin Miller sustained a devastating brain injury as a result of the accident.

Jerry Ivey, a deputy with the Clarke County Sheriff's Department, was dispatched to the scene and investigated the accident.  When he arrived, both vehicles were on the west side of the road and were facing west.  Ivey observed two sets of skid marks in the northbound lane and in the center of the highway; he saw no skid marks in the southbound lane.  He also observed a gouge mark in the highway's center.  Ivey testified that the nature of the accident was obvious from the physical evidence: The vehicles had been traveling in opposite directions in the northbound lane at the same time and had crashed head on at a slight angle.  As a part of his investigation, Ivey searched the vehicles and found an empty beer can in the truck, accompanied by a strong smell of alcohol.  Based upon the possibility that alcohol was a factor in the accident, Ivey went to the hospital and obtained a blood sample from Irby.  Ivey testified that Irby orally consented to the sample and signed a consent form.

The analysis of the blood sample by the state crime lab yielded a negative result for alcohol.  However, the sample was positive for alprazolam (Xanax), hydrocodone, and benzoylecgonine (BZE), a breakdown product of cocaine.  John Stevenson, a forensic

2

toxicologist at the crime lab, testified that the lab received a request for a quantitative analysis of these substances.  Because the state crime lab does not perform quantitative analyses, the sample was sent to National Medical Services (NMS) in Philadelphia, Pennsylvania, for this purpose.  NMS released a report that included an impairment statement by Dr. Laura Labay, a forensic toxicologist with NMS.  The relevant portion of the statement was as follows:

> Based on the concentration of alprazolam and hydrocodone found in this case, it can be stated with reasonable scientific certainty that if the individual showed signs of impairment (e.g. evidence of erratic driving, unusual demeanor, etc.), then these substances can be responsible for the production of that impairment, especially in the absence of another more competent cause.  Such impairment would be characterized by diminished faculties associated with the safe operation of a motor vehicle, including impaired alertness, judgment, perception, coordination, response time, and sense of care and caution.  These decrements can cause the individual to be impaired to and beyond the point of rendering this individual unfit to operate a motor vehicle safely.

[17-6] at 77.[1]  The report was admitted into evidence, and Dr. Labay testified at trial consistent with her report.  In her testimony, Dr. Labay described the level of alprazolam in Irby's blood as potentially toxic.  She explained that there was no pharmacological activity associated with the BZE.

Two witnesses testified at trial as to an automobile accident involving Irby earlier that same day.  Gene Jay observed Irby in his truck in a swamp-like area off the road.  When Jay asked him what had happened, Irby told him that he had been "having a conversation with the good lord and he closed his eyes to seal the deal," and when he opened his eyes, he found himself in the ditch.  [17-3] at 147.  Irby asked Jay to help pull

---

[1]Although this report was entered into evidence at trial, it has not been included in the trial record before this court.  The copy cited is an exhibit to Irby's PCR application.

out his truck.  Jay testified that he refused because Irby did not "act like he ought to be driving." *Id.* at 144.  Instead, Jay called 911.   Another witness, Sherrie Hosteler, lived near the scene of this earlier accident and saw Irby and his truck in a large water-filled ditch as she was pulling out of her driveway.  Hosteler went to a neighbor for help and brought the neighbor back to the scene, but the neighbor stated he was unwilling to pull Irby out.

Chuck Fisher, a volunteer fire fighter, was a first responder at the scene of the accident.   He spent several minutes assisting Irby.  Fisher recalled seeing an empty beer can on the floor of Irby's truck.  On cross examination, Fisher testified that Irby talked with him and was cooperative.

Also testifying for the state was Roger Robinson, a deputy sheriff who lived close to the accident scene.  He testified that at Ivey's request, he looked at the road and saw skid marks in the northbound lane.  Robinson also testified as to the width of the east shoulder of the road and the depth of the ditch.  He estimated that the ditch was approximately two feet deep and that the shoulder was about six feet wide.  When asked whether the shoulder was wide enough to allow a vehicle to pass, he testified, "[n]ot really." [17-4] at 24-25.

### III.  GROUNDS ASSERTED AND STANDARD OF REVIEW

Irby seeks a writ of habeas corpus based upon the following grounds:[2]

---

[2]Irby numbered his grounds for relief one through eighteen in the amended petition, and the undersigned has retained Irby's numbering herein.  However, some of his specific allegations, especially those of ineffective assistance, are not

I.      The following acts or omissions by his attorneys constituted ineffective
        assistance:

     A.      Failure to challenge admission of the blood sample on the basis of
                lack of consent.

     B.      Failure to present evidence that Irby had not consumed alcohol and
                was not impaired at the time of the accident.

     C.      Failure to present evidence showing that the Millers had had a boat
                accident earlier in the day and were impaired.

     D.      Failure to point out that Olivia Miller could easily have avoided the
                accident by moving to the right shoulder of the road.

     E.      Failure to call Nora Irby to testify about the photographs of the road.

     F.      Failure to object to Deputy Ivey's testimony as to how the accident
                occurred and to challenge his testimony.

     G.      Failure to call Lauren Westbrook and another nurse to testify
                regarding the circumstances surrounding the taking of the blood
                sample.

     H.      Failure to present evidence regarding Irby's prescriptions for
                alprazolam and hydrocodone.

     I.      Failure to call Jerry Irby to testify.

     J.      Failure to cross-examine Olivia Miller about the Waverunner accident

---

numbered or lettered separately.  For clarity, the undersigned has added letters to
identify Irby's ineffective assistance claims.  The undersigned has also slightly
reworded Irby's grounds for relief where appropriate.

earlier that day and to have blood samples taken from her and Justin Miller during their treatment at the emergency room after the accident.

K.      Failure to cross-examine Olivia Miller regarding her failure to avoid the accident.

L.      Failure to point out the inconsistency between Ivey's testimony and Olivia Miller's testimony concerning the source of the smell of alcohol.

M.      Failure to call Nora Irby to testify about Irby's lawn mowing habits.

N.      Failure to emphasize that Olivia Miller had just come around a curve when she saw Irby.

O.      Failure to call any defense witnesses.

P.      Failure to object to instruction S-1 on the basis that it used the word "impairment," whereas the indictment did not contain an allegation of impairment.

Q.      Failure to object to jury instruction S-1 on the basis that it did not require the jury to find that drug impairment was the cause of the accident.

R.      Failure to object to instruction S-1 on the basis that it did not require the jury to find that negligence from drug impairment was the cause of the accident.

S.      Failure to object to instruction S-1 on the basis that the instruction assumed that Irby was driving negligently.

T.      Failure to object to the indictment and to S-1 on the basis that they did not require that the impairment be proven and be proven to have been the cause of the negligence.

U.      Failure to challenge the statute on the basis that it allows a verdict of guilty with only a slight degree of negligence.

V.      Failure to challenge the statute on the basis that it allows a conviction even if negligence is not the sole proximate cause of the accident.

W.      Failure to offer an instruction requiring a finding beyond a reasonable doubt that Irby's impairment was caused by drugs, that the

6

impairment caused the him to operate his vehicle negligently, and that his negligence was the sole proximate cause of the accident.

X.    Failure to request a circumstantial evidence instruction.

Y.    Failure to request an instruction that an expert's testimony may be disregarded.

Z.    Failure to argue that the expert's testimony was speculative as to the impairment and the time of use of drugs.

AA.   Failure to challenge the scientific basis of the expert's opinion, and, particularly, the expert's use of evidence of erratic driving to support her opinion as to impairment by drugs.

BB.   Failure to object to the admission of Dr. Labay's report and to the court's allowing it to be taken to the jury room.

CC.   Failure to offer a jury instruction on intervening cause.

DD.   Failure of appellate counsel to raise issues of ineffective assistance and plain error that should have been raised.

EE.   Failure of appellate counsel to raise the issue of the trial court's denial of defense funds for the hiring of an expert.

II.    The trial court erred in admitting the testimony of Dr. Labay on the issue of impairment and in allowing her to speculate that Irby could have had a low level of cocaine in his system at the time of the accident.

III.   It was fundamental error for the jury instruction to reference cocaine impairment.

IV.   It was fundamentally unfair and an unfair emphasis on testimony for the court to allow Dr. Labay's impairment statement to go to the jury room.

V.    It was fundamentally unfair and a denial of Irby's right to a fair trial for Dr. Labay's report to go to the jury room.

VI.   Jerry Ivey should not have been allowed to testify that the cause of the accident was clear.

VII.  Irby's rights to due process and his rights under the Confrontation Clause were denied by the Court's refusal to allow defense counsel to cross

examine Ivey concerning the consent form signed by Irby.

VIII.   Defense counsel's advice that Irby not testify violated Irby's rights under the Confrontation Clause.

IX.   Irby was denied his right to testify.

X.   The indictment was fatally defective in that it did not allege that substances had impaired Irby's ability to operate a motor vehicle.

XI.   The taking of the blood sample was without consent and in violation of the Fourth Amendment.

XII.   The court's denial of funds for an independent toxicologist violated Irby's rights under the due process and confrontation clauses.

XIII.   Evidence from the blood sample should not have been admitted.

XIV.   The blood sample was obtained illegally.

XV.   The statute under which Irby was convicted is unconstitutional, in that it does not require the jury to find that the impairment was the cause of the negligence.  The jury should have been instructed that in order to convict, they had to find that impairment from drugs caused Irby's negligence.

XVI.   The Mississippi Supreme Court should have reversed the conviction.

XVII.   Irby was denied his rights to a fundamentally fair trial, due process of law, trial by a fair jury, and equal protection of the laws.

XVIII.  Irby is actually and factually innocent.

All of the grounds for relief discussed below were adjudicated on the merits by the

state court, either in Irby's direct appeal or in his application for post-conviction relief.

They are therefore subject to the highly deferential standard of review set forth in the

Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d), which

allows habeas relief in this case only if the state court's rejection of Irby's claims involved

"an unreasonable application of . . . clearly established Federal law . . .  as determined by

the Supreme Court of the United States" or "an unreasonable determination of the facts"

in light of the evidence presented to the state court. *Id.* The Supreme Court has

repeatedly emphasized that " 'an *unreasonable* application of federal law is different from

an *incorrect* application of federal law.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting

*Williams v. Taylor*, 529 U.S. 362, 410 (2000)). "[A] federal habeas court may not issue the

writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly."

*Williams*, 529 U.S. at 411. Rather, the application must be not only incorrect but also

"objectively unreasonable." *Id.* at 409.

This court's review of Irby's claims of ineffective assistance of counsel is "doubly

deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Analysis of ineffective

assistance claims begins with the well-known test set forth in *Strickland v. Washington*,

466 U.S. 668 (1984). Under *Strickland*'s two-prong analysis, a petitioner must first show

that his attorney's performance was deficient. *Id.* at 688. "Deficient" means that counsel's

performance was "outside the wide range of professionally competent assistance." *Id.* at

690. If a petitioner succeeds in establishing this first prong, he must go on to demonstrate

that his attorney's deficient performance prejudiced the defense such that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Id.* at 694. The standard of review of an

attorney's performance is "highly deferential," and a court considering an ineffectiveness

claim is to "indulge a strong presumption that counsel's performance falls within the wide

range of reasonable professional assistance." *Id.* at 689.

The difficulty faced by a habeas petitioner in seeking to establish a claim of ineffective assistance is compounded when the claim is viewed through the lens of § 2254(d).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Harrington v. Richter,* 131 S.Ct. 770, 788 (2011). In short, a habeas petitioner's burden of overcoming AEDPA's deferential standard of review is an extremely difficult one; the burden only increases where a petitioner is asserting ineffective assistance claims.

## IV.  ANALYSIS OF GROUNDS FOR RELIEF[3]

### *Admission of Blood Sample Evidence*

A number of Irby's asserted grounds for habeas relief involve the admission of the

analysis of his blood sample.  After the blood analysis report was released, Irby's attorney

filed a motion in limine.   Defense counsel, unaware that Irby had consented to the

drawing of the blood sample, and assuming that the blood had been drawn pursuant to

Miss. Code Ann. § 63-11-7, argued in the motion that the analysis was inadmissible to

---

[3]A number of the items included as grounds for relief in the petition fail to set
forth any cognizable habeas claim.  For example, in ground eighteen, Irby alleges
that he is actually and factually innocent.  A substantive claim of actual innocence is
not cognizable on habeas review, with the possible exception of capital cases.
*Herrera v. Collins*, 506 U.S. 390 (1992).  Furthermore, even if this allegation raised a
cognizable claim, because it has never been raised in state court and because state
review would now be unavailable, it would be procedurally barred pursuant to *Sones
v. Hargett*, 61 F.3d 410 (5th Cir. 1995) (holding that where a prisoner fails to properly
exhaust his state remedies, and his claims would now be procedurally barred in state
court, federal review is precluded).

Moreover, several of the claims in the petition have been pled in a vague or
conclusory fashion.  Rule 2 of the Rules Governing Section 2254 Cases requires that
a petitioner set forth the facts supporting each ground for relief.  "'[N]otice' pleading is
not sufficient, for the petition is expected to state facts that point to a 'real possibility
of constitutional error.'" Rule 4, Rules Governing Section 2254 Cases, Advisory
Committee Notes; *see also McFarland v. Scott*, 512 U.S. 849, 860 (1994) ("habeas
petition, unlike a [civil] complaint, must allege the factual underpinnings of the
petitioner's claims") (O'Connor, J., concurring in the judgment in part).  Irby is
represented by counsel in this action.   While *pro se* habeas petitions are construed
liberally, no such latitude is afforded to petitions prepared by counsel. *Woodfox v.
Cain,* 609 F.3d 774, 792 (5th Cir. 2010).  Thus, this Court is under no obligation to try
to find support in the record for Irby's vague allegations of constitutional error.

In the opinion which follows, the undersigned has limited the discussion to
those allegations which the undersigned believes to merit analysis.  Any not
mentioned have been rejected as patently insufficient to meet even the most minimal
standard for consideration of habeas relief.

show the presence of substances other than alcohol.[4]   It appears that at this time, the

prosecutor was also unaware that Irby had signed a consent form for the blood sample.

At the pretrial motion hearing, the court, at the request of the state, continued

consideration of the motion until the day of trial.  However, the motion was not raised on

the day of trial, presumably because by this time the attorneys had learned about the

existence of the signed consent form.

The issue of consent arose next in the context of Deputy Ivey's testimony at trial

concerning the circumstances surrounding the taking of the blood sample and the signing

of the consent form.  Ivey testified that he asked Irby for permission to draw the blood and

that Irby agreed.  He acknowledged that Irby had been suffering from a collapsed lung at

the time, but he described him as nevertheless alert and awake.  Ivey stated that he

asked Lauren Westbrook, a nurse in attendance, whether Irby was capable of giving

consent, and she affirmed that he was.  Ivey read part one of the consent form to Irby,

and Ms. Westbrook read to him the portion to be signed by him and placed an "X"

indicating the signature line.  Irby, however, signed further down on the form, and his

---

[4]The statute upon which defense counsel relied provides in relevant part as
follows:

> If any person be unconscious or dead as a result of an accident, or
> unconscious at the time of arrest or apprehension or when the test is to
> be administered, or is otherwise in a condition rendering him incapable
> of refusal, such person shall be subjected to a blood test for the
> purpose of determining the alcoholic content of his blood as provided in
> this chapter, if the arresting officer has reasonable grounds to believe
> the person to have been driving a motor vehicle upon the public
> highways, public roads and streets of this state while under the
> influence of intoxicating liquor.

Miss. Code Ann. § 63-11-7.

signature was somewhat illegible.  Ms. Westbrook and another nurse signed the form as witnesses.  Twice during this testimony, defense counsel objected, arguing that the consent was invalid.  The judge overruled the objections, pointing out that the issue had not been raised in a motion in limine prior to trial and finding that it was therefore waived.

Irby argues that he is entitled to habeas relief because the blood sample was taken without valid consent in violation of the Fourth Amendment and should not have been admitted.  Irby claims that at the time the sample was taken, his injuries from the accident had rendered him incapable of giving consent.  This claim does not set forth a basis for relief:  Because Irby had a full and fair opportunity to litigate any fourth amendment claim in the state court, habeas relief is foreclosed.  *See Stone v. Powell*, 428 U.S. 465 (1976).

Irby also makes numerous allegations of ineffective assistance of counsel concerning the blood sample.  He argues that his attorney should have filed a motion in limine to exclude the blood sample on the basis of lack of consent, that he should have called Irby's mother, Nora Irby, to testify as to Irby's diminished capacity when Irby signed the consent form, that he should have offered into evidence Irby's medical records showing his injuries at the time, and that he should have called the nurses who were present to testify as to his condition.  Irby has not, however, come forward with any affidavit from Nora Irby or the nurses indicating what their testimony would have been on this issue; indeed, there is no evidence that Nora Irby was even present when Irby signed the consent form.[5]

---

[5]In his own affidavit, Irby states that he "was not in any way physically or mentally to comprehend what [he] was signing." [17-6] at 42-43.  It appears that Irby was attempting to testify in his affidavit that he was not physically or mentally able to comprehend the consent form when he signed it.  Other than this one self-serving

The state court's rejection of this claim was clearly reasonable in light of the lack of evidence to support it. *See* 28 U.S.C. § 2254(d)(2).  In short, the state court, in reviewing this claim, could have reasonably concluded both that there was no deficient performance on counsel's part and that Irby was not prejudiced by these alleged failures.  Thus, relief is unavailable.

### Expert Testimony of Dr. Labay

At trial the prosecution tendered Dr. Labay as an expert in forensic toxicology.  In response, defense counsel attempted to use the NMS reports in conducting voir dire on Dr. Labay's qualifications to give an impairment statement.  After the prosecution objected, the court ruled that defense counsel could ask Dr. Labay about her educational and training background but could not go into the reports on voir dire.  Defense counsel then accepted Dr. Labay as an expert in the field of toxicology, and the court accepted her as an expert in forensic toxicology.

Dr. Labay testified that NMS routinely performs toxicology testing for the Mississippi Crime Lab.  She explained that unlike the state crime lab, NMS has the capability to perform quantitative drug analyses on blood samples.  The state crime lab sent to NMS a portion of Irby's blood sample, the result of the analysis performed by the crime lab, and a request for quantitative analysis and for an impairment statement.

Dr. Labay explained the quantitative test results at trial, testifying consistent with her report.  With regard to the test result indicating the presence of BZE, she stated that

---

statement in his affidavit, Irby provides no evidence that he lacked the capacity to consent when he signed the consent form.

BZE is a cocaine degradation product.  Its presence indicates that at some point in time Irby had cocaine in his system.  She explained that no cocaine was found in the blood sample and that BZE has no pharmacological significance.  The prosecutor then asked her about the level of hydrocodone in the sample and whether the level was therapeutic or toxic.  Dr. Labay stated that Irby's blood sample contained 90 ng/ml of hydrocodone.  She admitted that the meaning of a particular level of hydrocodone is difficult to determine in the absence of information concerning an individual's history with regard to the drug.  As to the level of alprazolam in the sample, which was 87 ng/ml, Dr. Labay testified that alprazolam is potentially toxic at levels greater than 75 ng/ml.  She explained that both hydrocodone and alprazolam can have a depressive effect and cause drowsiness and that their effects would be additive.

The prosecutor then presented Dr. Labay with the hypothetical of an individual having the drug concentrations found in Irby's blood and driving his vehicle on the wrong side of the road.  He asked her to opine as to whether the hydrocodone and alprazolam would contribute to the individual's operation of his vehicle in the manner described. Defense counsel objected to the presumed facts, but the court overruled the objection. Dr. Labay, testifying from her written impairment statement, stated as follows:

> Based on the concentration of Alprazolam and Hydrocodone found in this case, it can be stated with reasonable scientific certainty that if the individual showed signs of impairment--and examples of that that we listed here include evidence of erratic driving, unusual demeanor--then these substances can be responsible for the production of that impairment, especially in the absence of a more competent cause.  Such impairment would be characterized by diminished faculties associated with the safe operation of a motor vehicle, including impaired alertness, judgement, perception, coordination, response time and sense of care and caution. These decrements can cause the individual to be impaired to and beyond the point of rendering this individual unfit to operate a motor vehicle safely.

15

[17-3] at 3.  In response to questioning, she stated that even though there was no cocaine in the specimen, it was possible that a low level was in Irby's blood at the time of the accident and had been metabolized by the time the sample was taken.

Irby contends that his attorney rendered ineffective assistance in failing to challenge (presumably by a motion in limine, objection, or cross-examination) Dr. Labay's opinion as speculative and not scientifically based.  Although Irby's argument is not entirely clear, he appears to be relying upon two factors to support his claim that the testimony was unscientific and speculative:  First, Dr. Labay's reliance on Irby's reported behavior to support a finding that a cause of his impairment could have been the levels of alprazolam and hydrocodone in his system, and, second, that her lack of familiarity with Irby's medical history and, particularly, his history with regard to these drugs.  As to the first of these, Irby has not explained why reliance on Irby's reported behavior undermined Dr. Labay's opinion.   As to medical history, defense counsel cross-examined Dr. Labay regarding her lack of knowledge of Irby's medical history, and she admitted that she had no knowledge of how Irby responded to his drugs when taken as prescribed.  Defense counsel pointed out this lack of knowledge to the jury in his closing argument.  But Irby has not shown that this lack of familiarity with Irby's medical history would have been a basis for exclusion of Dr. Labay's opinion, given the very limited nature of that opinion. Dr. Labay never opined that the level of drugs in Irby's system contributed to his operation of his vehicle in an unsafe manner.  Rather, her opinion was that *if* Irby was impaired and operated his vehicle in an unsafe manner, the drugs in his system *could* have been responsible for that impairment.

Finally, Irby contends that his attorney should have objected to the court's allowing a copy of Dr. Labay's report to go to the jury room with the jury.   Irby complains that giving the report to the jury placed an unfair emphasis on Dr. Labay's testimony.  He has not, however, shown that this objection would have been warranted under the applicable law.

In none of these claims has Irby made a plausible argument that his attorney rendered deficient performance or that he was prejudiced thereby.  Irby's *Strickland* claims regarding Dr. Labay's opinion do not warrant relief.

Irby's remaining grounds for relief regarding the state's expert testimony are that his rights under the confrontation clause were violated when the trial court denied his motion for money for the defense to hire its own toxicologist,[6] that the trial court erred in allowing the expert's report to go to the jury room, and that the trial court should have excluded Dr. Labay's testimony.  Irby has identified no clearly established Supreme Court law governing these issues, much less has he explained how the state supreme court's rejection of these claims was contrary to that law.  These claims are without merit.

### Elements of Crime, Elemental Jury Instruction, and Indictment

Several of Irby's grounds for relief concern the statutory elements of the crime of DUI maiming, and jury instruction S-1, which set forth its elements.  The statute under which Irby was charged and convicted states in relevant part as follows:

---

[6]In his motion, Irby requested not a defense toxicologist, but an independent toxicologist, and this is the language used in his habeas petition.  However, it is apparent that he was not asking for the Court to hire an independent toxicologist, but, rather, that he be given funds to hire his own.

> (1)     It is unlawful for any person to drive or otherwise operate a vehicle within this state who . . . is under the influence of any . . . substance which has impaired such person's ability to operate a motor vehicle. . . .

> . . . .

> (5)     Every person who operates any motor vehicle in violation of the provisions of subsection (1) of this section and who in a negligent manner causes the death of another or . . . disfigures [or] permanently disables or destroys [a limb, organ or member] of another shall, upon conviction, be guilty of a separate felony . . . .

Miss. Code Ann. § 63-11-30.

The instruction setting out the elements of this crime informed the jurors that they were to return a verdict of guilty if they found, beyond a reasonable doubt, that Irby

> did willfully and unlawfully and negligently operate a motor vehicle on the public street or roadway while under the influence of a substance impairing his ability to operate a motor vehicle . . . [a]nd that as a result of his negligent driving, did cause his vehicle to crash into a motor vehicle occupied by Justin Miler causing mutilation or disfiguring injury to Justin Miller.

[17-1] at 43.

Irby contends that his attorney should have objected to instruction S-1 because it included the word "impairing," which was not in the indictment, and because it did not require the jury to find that Irby's impairment from drugs was the *cause* of his negligence. Irby's argument is based upon what he wishes the statute says, not its actual language. The instruction accurately reflected the statutory elements.  Irby cannot fault his attorney for having failed to make meritless objections.  Similarly, his claims that his attorney was ineffective for failing to submit instructions requiring a finding that the impairment caused the negligence and that the negligence was the sole proximate cause of the accident provide no basis for relief, as these requirements are not set forth in the statute.

18

Irby complains that his attorney should have objected to the phrase "as a result of his negligent driving" because it contains an assumption that Irby was driving negligently. This argument is meritless, as would have been any such objection, as the opening phrase of the portion of the instruction quoted above required the jury to find, beyond a reasonable doubt, that Irby had operated his vehicle negligently.

Similarly, Irby's claims that his rights were violated by the giving of this instruction are without merit; he has not shown that the giving of this instruction or the failure to give any other instruction infected the entire trial such that the Irby's conviction violated due process.  See *Estelle v. McGuire*, 502 U.S. 62, 72 (1991);  *Galvan v. Cockrell*, 293 F.3d 760, 764-65 (5th Cir. 2002).

In a more direct attack in this regard, Irby argues that Miss. Code Ann. § 63-11-30 is constitutionally infirm because it does not require that the drug impairment be the cause of the negligent driving and that the driver's negligence be the sole proximate cause of the accident.  He also contends that his attorney should have challenged the statute on these and other bases.  Irby makes no argument, however, as to any constitutional principle that would have required additional or different elements to be included in the statute, and the undersigned is aware of none.  These arguments are without merit.

In this same vein, Irby challenges his indictment as fatally defective because it failed to charge that the substances had impaired his ability to operate a motor vehicle. Federal habeas relief is not available for insufficiencies of a state indictment unless the petitioner can demonstrate that the indictment was so flawed that the trial court had no jurisdiction.  *Evans v. Cain,* 577 F.3d 620, 624 (5th Cir. 2009).  Irby has made no such

showing.

Finally, Irby contends that his attorney should have requested an "intervening cause" instruction, an instruction on circumstantial evidence, and an instruction informing the jury that they could disregard expert testimony.  He has not, however, made any argument as to how or why either of these instructions would have been appropriate under the law and has not shown that he was prejudiced, within the meaning of *Strickland*, by their omission.  This ground for relief fails as a matter of law.

### Defense Counsel's Failure to Present Evidence that Irby was Not Impaired

In his petition, Irby has identified several individuals whose testimony, he claims, would have tended to prove that he had not consumed alcohol and was not impaired at the time of the accident.  He argues that his attorney's failure to call these persons to testify at trial constituted ineffective assistance.  Irby also argues that his attorney should have introduced his medical records from Weems Community Mental Health Center to show that he had been prescribed the drugs that were in his system.

Irby has provided statements from three of these proposed witnesses: Bill Snowden, Dorothy Hagwood, and Nora Irby, his mother.  Bill Snowden, a wrecker service owner, states in his unsworn statement that he pulled Irby's vehicle out of a ditch earlier in the day.  He says that Irby's appearance seemed normal, but that Irby never explained how he wound up in the ditch.  Dorothy Hagwood, a store clerk, states in her unsworn statement that Irby stopped by her store shortly before the accident and purchased a 12-pack of beer.  She says the beer was unopened when he left the store and that she did not smell beer on Irby.  In a sworn affidavit, Nora Irby says that her son went for a haircut

20

on the morning of the accident and was sober when he left the house.  She also states that Irby had taken prescriptions for Xanax (alprazolam) and Lortab (hydrocodone), as prescribed, and also took "sleeping medicine" because "he could not sleep." [17-6] at 58.

These allegations of ineffective assistance are without merit.  There are obvious reasons why defense counsel may have chosen not to call these witnesses.  Furthermore, Irby has not shown prejudice.  Given the evidence of the amount of drugs in Irby's system and the manner in which he operated his vehicle, Irby cannot establish that it is more likely than not that had this evidence been presented, the result of the trial would have been different.  *See Strickland*, 446 U.S. at 694.

### Testimony of Jerry Ivey

Deputy Ivey testified that he personally observed two sets of skid marks in the northbound lane, one which led to the Millers' vehicle and one which led to Irby's vehicle, and gouge marks in the middle of the road.  He testified that it was obvious from the skid marks and the gouge marks that the accident had occurred because Irby was driving in the wrong lane and that the impact had occurred in the middle of the road.

In his cross-examination of Ivey, defense counsel repeatedly challenged Ivey's qualifications and ability to render such an opinion.  In both his cross-examination and his closing argument, Irby's attorney attempted to convince the jury that Ivey's one week of accident analysis training was insufficient and that Ivey should have called in an accident reconstructionist to help determine how the accident occurred.  Even so, Irby argues that his attorney rendered ineffective assistance by failing to do more by objecting to Ivey's opinion and attempting to exclude it.

Irby has not, however, shown the requisite deficient performance or prejudice under *Strickland* on these allegations of ineffective assistance.  Ivey testified as to his personal observations, and his opinion amounted to nothing more than stating the obvious.  This claims has no merit.

Irby also argues that defense counsel should have pointed out to the jury the inconsistency between Ivey's and Fisher's testimony concerning the location of the  empty beer can in Irby's truck.  Ivey recalled that the beer can was on the driver's floorboard, whereas Fisher testified that it was on the floorboard on the passenger side.  Given the evidence against him, Irby cannot show that had his attorney pointed out this small inconsistency, the result of the trial would have been different.

As a separate basis for relief, Irby contends that it was error for the trial court to allow Ivey's testimony as to how the accident occurred.  Irby has not, however, articulated an argument as to why the testimony was inadmissible.  Furthermore, erroneous state court evidentiary rulings provide a basis for habeas relief only if they rise to the level of a constitutional violation or render the trial fundamentally unfair.  *Gonzales v. Thaler*, 643 F.3d 425, 430 (5th Cir. 2011).  Irby has failed to offer any explanation as to how admission of Ivey's testimony meets this difficult standard.  This ground for relief raises no constitutional issue.

### Irby's Decision not to Testify

Irby asserts that he was denied his right to testify on his own behalf.   At trial, the court conducted a thorough examination of Irby on his right to testify.  During the colloquy, Irby affirmed that he understood his rights.  However, when asked to give his decision,

Irby appeared to have difficulty making up his mind whether to take the stand:

Q.    Mr. Irby, do you understand that you may choose to testify in your own
      defense in this case?

A.    Yes, sir.

Q.    Do you understand that you may choose to remain silent and not testify?

A.    Yes, sir.

Q.    Do you understand that this choice is yours alone and not the choice of your
      attorneys, Mr. Jordan and Mr. Falgout?

A.    Yes, sir.

Q.    Have you consulted with your attorneys as to whether or not you should
      testify?

A.    Yes, sir.

Q.    Do you understand that your attorneys cannot prevent you from testifying if
      you want to do so and that you also cannot be forced to testify if you don't
      want to?  Do you understand that?

A.    Yes, sir.

Q.    Do you understand that if you testify, the prosecutor will be allowed to cross-
      examine you in front of the jury while you're under oath?

A.    Yes, sir.

Q.    Do you understand that if you have been convicted of a felony in the past,
      the prosecutor may be allowed to ask you about it in front of the jury if the
      jury--if the Court rules that prior felony conviction to be admissible.  Do you
      understand that?

A.    Yes, sir.

Q.    Do you understand that if you've had a felony conviction before this case,
      the jury can be instructed by the Court to consider it only as it relates to
      whether you're telling the truth or not if the Court rules that prior felony to be
      admissible?  Do you understand that?

A.      Yes, sir.

Q.      That is, it would only go to your credibility.  Do you understand that?

A.      Yes, sir.

Q.      Do you understand that if you choose not to testify, the jury can be instructed that they are not to use your silence against you in deciding this case?  Do you understand that?

A.      Yes, sir.

Q.      Have you decided; that is, have you made a decision whether or not you wish to testify?

A.      I'm going to testify.

Q.      First of all, have you made a decision to testify or not testify?

A.      Not completely, your Honor.  My mental capacity and physical--I get confused at points, but I am sure if I am questioned and asked about that accident or whatever, but--and the extent of my doctors' care, I'll do the best I can.  Answer to the best of my--if I do not have the answer, can I just–

Q.      Well, I'm not going to--I'm not here to advise you.  You're' not answering my question.  My question is have you decided whether or not you wish to testify or not testify?

A.      I'll–

Q.      The State has rested their case.

A.      I'll testify.

Q.      Have you made a decision to testify or not testify?

A.      I've made a decision to testify.

Q.      You have?  And what is that decision?

A.      I will testify.

Q.      You want to testify?

A.     Yeah.

Mr. Jordan:   Did he say not or want?  Come here, Thomas.

(Pause in Proceedings)

Mr. Jordan:   Ask him again, your Honor.

Q.     All right.  Since there was confusion on your answer, Mr. Irby, do you want to testify or do you not want to testify?

A.     I want to testify.

Q.     You want to?

A.     (Witness nods head affirmatively.)

Q.     You want to testify in your own defense?

A.     Yes, sir.

A.     Okay.

The Court:   Mr. Jordan--and you can have a seat back at the table.  Mr. Jordan and Mr. Falgout, have you counseled with your client concerning testifying and not testifying?

Mr. Jordan:   Yes sir, we have, your Honor.

The Court:   Is it--do you feel that this--his decision to testify is an informed decision being made by him?

Mr. Jordan:   Your Honor, I certainly think he's informed, but for the record, Mr. Irby has vacillated back and forth between yes and no, and also after conferring with his mother yes and no; then after conferring with his mother, it's no.  But now it's yes.

The Court:   Mr. Falgout?

Mr. Falgout:  I would concur with what Mr. Jordan said.

The Court:   All right.  Well, I need to ask you one more question then.  After giving him legal advice, do you agree with his decision to testify?

Mr. Jordan:   No.

The Court:   Mr. Falgout?

Mr. Falgout:  No.

Q.     All right.  Mr. Irby, your--do you understand that by testifying, you are going
       against the legal advice of each of your attorneys?

A.     I understand, but I'm going to stand with my attorneys.

Q.     Sir?

A.     I'm going to stand with my attorneys.  No is my answer.

Q.     What does that mean?

A.     It means, no. I will not testify on my behalf.

Q.     You're not going to testify?

A.     No, sir.

Q.     So you've changed your decision again.  Mr. Irby, you've gone back and
       forth with your attorneys, apparently with your mother, and now with the
       Court.  One last time, and this is going to be your answer because I'm not
       giving you another chance.  Do you want to testify or not; yes or no?

A.     No.

[17-4] at 41-45.

A criminal defendant has a fundamental right to testify at his trial.  *Jordan v.*

*Hargett*, 34 F.3d 310, 312 (5th Cir. 1994) (citing *Rock v. Arkansas*, 483 U.S. 44, 49-52

(1987)).  Where a defendant chooses not to testify, he can establish a violation of the right

only if he shows that the final decision was made against his will.  *Id.*  In support of this

ground for relief, Irby has submitted his own affidavit and that of his mother, Nora Irby.

Irby states as follow regarding his decision:

26

> I was always wanting to testify.  My mother and other witnesses were waiting.  We had the discussion to testify right there in the courtroom and it was obvious my attorney's [sic] didn't want me to testify, even to the point of mis-representing that they had done a good job.

[17-6] at 44.  In the relevant part of Nora Irby's affidavit (which is at times written in the third person) she states as follows:

> Nora was taken into the court room, and they said Tommy could not make up his mind about testifying.  Tommy are you o.k. and I though [sic] yo [sic] were going to testify and he said he wanted to, but he said now he does not know, what should I do and she said Tommy I cant [sic] tell you, you're going to have to make that decision because its your life.  Falgout said Tommy don't you think that we've done a good enough job (implying he didn't need to testify) and Tommy said I don't know.  They told him yo've [sic] got to make a decision and so, Tommy looked at his mother scared to death and hung his head and said he would not testify.  By that time the judge was in the courtroom and they all appeared, less Nora before the courtroom, Tommy was about to break down and cry.  All along he was going to testify.

[17-6] at 57.

Admittedly, the colloquy and the affidavits suggest that Irby had difficulty making his decision.  Nowhere, however, is there anything to support a finding that when he finally made a decision, it was not his own.  Even Irby himself has failed to state in his affidavit that he did not understand what he was doing when he told the judge he would not testify or that it was not his decision.  The most that can be concluded is that Irby initially wanted to testify but nevertheless ultimately decided not to testify.  Even if Irby's ultimate decision was heavily influenced by his attorneys' advice not to testify, mere acquiescence to an attorney's recommendation not to testify is not the same as a decision made against one's will.  *See Jordan*, 34 F.3d at 313 (explaining that there is "no violation of the right to testify if [the defendant] acquiesced during trial to his attorney's recommendations that he not testify.").  The undersigned concludes that the record contains a sufficient basis for the

state court to have reasonably concluded that notwithstanding his difficulty in making a decision, Irby understood the consequences of his decision and made a voluntary choice not to testify.

Irby also takes issue with the fact that his attorneys advised him not to testify, arguing that his rights under the confrontation clause were violated by this advice.  He claims that had he been allowed to testify, he would have told the jury that he had not been drinking the morning of the accident, that his prescription medication did not make him drowsy, that the earlier accident that day was caused by his attempt to avoid a deer in the road, and that he was driving on his side of the road when Olivia Miller turned her van into his lane.  Far from helping his case, some of Irby's proferred testimony would have strengthened the state's case against him.  Although Irby proposed that he would have testified that he had not been drinking, the toxicology test results on which the state relied did not show that he was under the influence of alcohol; rather, they showed the presence of drugs.  Apparently believing that it would have helped his defense, Irby claims that he would have testified that he had prescriptions for these drugs and that they did not make him drowsy, but such testimony would have actually strengthened the state's case through Irby's own admission that he had taken drugs before the accident.  And given Irby's admission that he had taken drugs, Irby would have been subjected to challenging cross-examination regarding the other accident earlier that day.  Further, Irby's proferred testimony that Olivia Miller was driving on his side of the road would have directly contradicted the physical evidence of the two sets of skid marks leading from Olivia Miller's lane to the respective vehicles' final resting places.  In addition, Irby had prior drug

28

convictions and a felony DUI, all of which could have become admissible if Irby had taken the stand and somehow "opened the door" during his testimony.

Given the overwhelming evidence against Irby, it is doubtful that his proffered testimony would have resulted in a different outcome.  *See Sayre v. Anderson*, 238 F.3d 631, 635 (5ᵗʰ Cir. 2001) (observing that, given the overwhelming evidence of guilt, court could not "conceive of anything [the defendant] could have said that would have provided *any* reasonable possibility of a different outcome.").  And as shown above, there was more than a sufficient basis for the advice of Irby's attorneys that he not testify.  This claim of ineffective assistance fails, as he has shown neither deficient performance or prejudice.


### Other Claims of Ineffective Assistance

In addition to the claims of ineffective assistance discussed above, Irby's petition contains a laundry list of miscellaneous "should haves" concerning his trial attorneys' performance.  None raises a plausible *Strickland* claim.  First, he faults his attorneys for failing to call Nora Irby to the stand to testify concerning photographs that were admitted into evidence.  The photographs, taken approximately nine months after the accident, purportedly showed the roadway at the accident site and were admitted into evidence during the cross-examination of Roger  Robinson.   During redirect examination, Robinson admitted that he did not know who had taken the photographs or whether they represented the accident site, and during closing argument, the state's attorney pointed out the uncertain nature of the photographs.  Irby argues that had his attorneys called Nora Irby to testify that she had taken the photos, the prosecutor would not have been

29

able to attack the photos as effectively.  However, it is not apparent from the trial record

that the photos were of any value to Irby's defense: The photos themselves are not

included in the record before this court, and the trial testimony about them is unclear as to

what they showed.[7]

Irby next contends that his attorneys should have pointed out that Olivia Miller

could have swerved to the right instead of the left and possibly avoided the collision.

However, whether or not she could have avoided the accident was not relevant to Irby's

guilt or innocence.  He also faults his attorney for failing to point out that Ivey testified that

he did not smell alcohol on Irby, whereas Olivia Miller testified that there was a strong

odor of alcohol in the ambulance.  Irby's characterization of Ivey's testimony is inaccurate:

Ivey testified that he did not get close enough to Irby to smell any alcohol.  This testimony

was not inconsistent with Miller's.

Another "should have" set forth in Irby's petition concerns a waverunner accident

involving the Millers which allegedly occurred earlier on the day of the accident.  He

argues that his attorney should have presented evidence of this accident and evidence

that the Millers were somehow impaired at the time.   In support of this ground, Irby has

offered an affidavit by his brother, Jerry Irby, in which the affiant states that he overheard

Justin Miller's stepbrother say that Olivia Miller had run over another boat with her boat

about two hours before the automobile accident.  Obviously, this hearsay-within-hearsay

statement does not constitute admissible or competent evidence that any such accident

ever occurred.  Neither has Irby shown that any witness to the accident was available and

---

[7]Photocopies of the photographs are attached to Irby's PCR application.  The quality of the copies is extremely poor.

willing to testify.

Irby's last charge of ineffective assistance on the part of his trial attorneys concerns Irby's physical condition.  The record indicates that Irby was using a walker at trial.  During Robinson's testimony, the prosecutor asked him to identify the defendant.  He also asked whether he had seen him recently, to which Robinson replied that he had seen Irby mowing his yard, at times using a push mower and at times a riding mower.  Irby argues that had his attorneys called his mother to the stand, she could have testified that she and Irby did not have a working push mower and that using the riding lawn mower was therapeutic for Irby.

None of these allegations concerns any important factual issue in the case, and Irby has shown neither deficient performance nor prejudice with regard to any of them. The state court could reasonably have concluded that none rise to the level of a Strickland claim.  Habeas relief is therefore unavailable.

Finally, Irby argues that his counsel on appeal was ineffective for failing to raise the trial court's denial of defense funds for a toxicologist and failing to raise the ineffective assistance claims enumerated above.   For the reasons stated above, the state supreme court could reasonably have concluded that appellate counsel's performance was not deficient and that the result of Irby's appeal would not have been different had these claims been raised.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (indicating that *Strickland'*s prejudice standard applies to claims of ineffective assistance of appellate counsel).

## V.  CONCLUSION

Irby has failed to establish that the state court's adjudication of any of his claims was contrary to, or involved an unreasonable application of, clearly established Supreme Court law or was based upon an unreasonable determination of the facts.   Accordingly, the undersigned recommends that habeas relief be denied and the petition be dismissed with prejudice.

The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendation contained within this report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court.  28 U.S.C. § 636; Fed. R. Civ. P. 72(b); *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996).

Respectfully submitted, this the 30th day of October, 2014.


/s/ F. Keith Ball_____
UNITED STATES MAGISTRATE JUDGE